**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON**

**OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,
and SIERRA CLUB,**

       **Plaintiffs,**

**v.**                                          **Civil Action No.  3:11-0696**

**ARGUS ENERGY, LLC D/B/A ARGUS
ENERGY WV, LLC,**

       **Defendant.**

**DEFENDANT ARGUS ENERGY, LLC D/B/A ARGUS ENERGY WV, LLC'S
<u>MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS</u>**

Defendant Argus Energy, LLC d/b/a Argus Energy WV, LLC ("Argus") submits this memorandum in support of its motion to dismiss the Complaint filed by Plaintiffs Ohio Valley Environmental Coalition, Inc., West Virginia Highlands Conservancy, Inc. and Sierra Club (collectively "Plaintiffs").  Plaintiffs' citizen suit has been mooted by the Consent Decree entered by the Honorable Judge Thornsbury in the parallel civil enforcement action commenced by the West Virginia Department of Environmental Protection ("WVDEP") against Argus in the Circuit Court of Mingo County.  That settlement resolves all of the claims brought against Argus by WVDEP and moots the duplicative claims that comprise this civil action.  In addition, WVDEP commenced the Mingo County litigation before Plaintiffs filed their Complaint in the instant case and has continued to diligently prosecute that action.  Accordingly, this Court lacks subject matter jurisdiction over Plaintiffs' claims under the federal Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and the federal Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. §§ 1201 *et seq.*  In either case, this civil action must be dismissed.

## FACTUAL BACKGROUND

The present case arises out of Argus's alleged violations of the effluent limitations for selenium contained in West Virginia/National Pollutant Discharge Elimination System – Water Pollution Control Act ("WV/NPDES") Permit No. WV1020013 (the "Permit").[1]   The Permit authorizes discharges from Argus's Copley Trace No. 2 Surface Mine in Lincoln and Mingo Counties, West Virginia.   Plaintiffs' Complaint focuses on two outfalls governed by the Permit: Outlet 006, which discharges into Copley Trace Branch of Kiah Creek, and Outlet 009, which discharges into an unnamed tributary of Laurel Branch of the East Fork of Twelvepole Creek.

The Permit requires Argus to monitor the discharges from each permitted outlet and report to WVDEP on a monthly basis the concentrations of certain specified parameters, including selenium.   Selenium was first added as a parameter of concern under the Permit when it was reissued on June 12, 2006.   In that reissuance, WVDEP imposed a "report only" requirement for selenium at Outlets 006, 009 and 015 until June 12, 2009, at which time Argus would become subject to enforceable discharge limitations for selenium at these outfalls.   Ex. A. On April 5, 2007, WVDEP issued Order No. 1091 to Argus, which modified the Permit to extend this "report only" period for selenium at Outlets 006, 009 and 015 through April 5, 2010 (the "April 2007 Modification").   Ex. B.   On April 6, 2010, this "monitor only" period would expire and the final effluent limitations for selenium of 4.7 µg/L (average monthly) and 8.2 µg/L (maximum daily) would take effect.   *Id.*   The April 2007 Modification also included a compliance schedule that required Argus to achieve specific milestones designed to lead to compliance with the final effluent limits for selenium by April 6, 2010, including the

---

[1]      The NPDES Permit was first issued to Pen Coal Corporation on June 30, 1999, and was transferred to Argus on September 16, 2003.  Since that time, the NPDES Permit has been reissued on June 12, 2006 and most recently on April 13, 2011.

construction of selenium treatment systems and the submission of reports to WVDEP summarizing the status of Argus's efforts to meet its compliance deadline. *Id.*

Significantly, from June 2006—when Argus began its required sampling for selenium at Outlets 006, 009 and 015—until September 2008, none of the sample results for the discharges from these outfalls reflected selenium levels exceeding the final monthly average limit of 4.7 *μg/L.* Ex. C, ¶ 15. Thus, for at least two years after selenium was included in the Permit as a parameter of concern, Argus had no reason to believe that additional treatment would be necessary to ensure compliance with its final selenium effluent limitations by April 6, 2010. On the contrary, Argus's data during this period supported the company's belief that selenium should be **deleted** as a parameter of concern because no reasonable potential existed for these discharges to cause or contribute to a violation of the selenium water quality criteria. In fact, Argus requested a permit modification seeking to remove selenium as a parameter of concern on April 7, 2008. *Id.* ¶ 16. While this modification request was pending, however, discharge data for Outlets 006 and 009 began showing sporadic fluctuations in selenium levels. *Id.* Due to the intermittent elevated selenium results at Outlets 006 and 009, WVDEP denied Argus's modification request with respect to these outfalls, but approved Argus' modification request to eliminate selenium as a parameter of concern at Outlet 015. *Id.* at ¶ 17.

In light of these sporadic elevated selenium results at Outlets 006 and 009 (i.e., which would have exceeded the final limitations had they been in effect), and consistent with its obligations under the April 2007 Modification, Argus promptly began evaluating potential selenium-specific treatment options in addition to the treatment systems already in place at these outfalls. *Id.* ¶ 18. Argus initiated a pilot-scale treatment project in 2009, in which Argus sprayed iron-rich sludge from its acid mine drainage ("AMD") treatment system onto the surface of the

pond associated with Outlet 006.  *Id.*  ¶¶ 18-19.  The pilot program was implemented to demonstrate that the iron in this sludge would bind to the selenium in the effluent (i.e., iron co-precipitation).  *Id.* ¶ 19.  A comparison of the selenium data before and after application of the iron-rich sludge at Outlet 006, as well as to data from Outlet 009 where no similar treatment program had been implemented, indicated clear reductions in selenium.  *Id.*

With the pilot-scale treatment program showing desired reductions in selenium discharge concentrations, Argus refined its treatment approach by (1) administering the iron-rich sludge in a systematic manner with the goal of creating an environment in its treatment ponds where selenium levels would be reduced proactively and (2) modifying its delivery system to apply the iron media by pellets at regular intervals.  *Id.* ¶ 20.  Argus installed treatment systems at Outlets 006 and 009, which use two different forms of iron media to enable Argus to characterize their relative effectiveness in reducing selenium levels in the effluent.  *Id.*  While these treatment systems are constructed and in place, this demonstration is ongoing and Argus continues to adjust, refine and improve this approach in response to its evolving evaluation of this technology.

In January 2010, Argus applied for a permit modification seeking to extend the "report only" requirement for selenium at Outlets 006 and 009 until July 1, 2012[2] and to establish a new compliance schedule with appropriate milestones to ensure the success of this treatment technology.  On February 22, 2010, WVDEP proposed to grant Argus's application, finding that the requested extension of the compliance schedule was appropriate based on Argus's efforts to date and the company's belief that further monitoring "will be required in order to prove the experimental AMD slurry/sludge treatment successful."  Ex. D at 2.

---

[2]   Such an extension was expressly authorized by the West Virginia Legislature.  See W. Va. Code § 22-11-6.

On March 31, 2010, the United States Environmental Protection Agency ("USEPA") filed a general objection to WVDEP's draft modification of the Permit, automatically extending USEPA's comment period on the draft modification for an additional 60 days pursuant to 40 C.F.R. § 123.44 and the Memorandum of Agreement between USEPA and WVDEP.  Ex. E. USEPA filed a specific objection to the draft modification of Argus's Permit on May 27, 2010. Ex. F.  Because WVDEP and USEPA were unable to resolve the objections raised in USEPA's specific objection letter, WVDEP ultimately denied Argus's modification application on August 24, 2010.  Ex. G.

Because USEPA's general objection extended the comment period on Argus's draft modification beyond the Permit's April 6, 2010 deadline for the selenium limitations to take effect, Argus filed an administrative appeal with the West Virginia Environmental Quality Board ("WVEQB") on April 2, 2010, challenging WVDEP's failure to timely act on its modification application under W. Va. Code § 22B-1-7(c).  Ex. H.  The WVEQB granted a stay of the final selenium limits in the Permit, precluding those limits from taking effect until the conclusion of the administrative appeal process related to Argus's modification request.  Ex. I.[3]  When WVDEP subsequently denied Argus's modification request due to failure to resolve USEPA's specific objection, Argus filed an appeal of this denial with the WVEQB on September 24, 2010. Ex. K.  Although previously set for hearing, the administrative appeals filed with the WVEQB have been continued to allow Argus and WVDEP to try to resolve the underlying issues through a consent decree in a circuit court enforcement action.  Ex. L.  In the meantime, the previously issued stays of the selenium limits in the Permit remain in place.

---

[3]     By order dated April 2, 2010, the Circuit Court of Kanawha County issued a similar injunction with respect to the selenium limits at Outlets 006 and 009.  Ex. J.

On April 14, 2010, Plaintiffs mailed a notice of intent to sue Argus over alleged violations of the selenium limits contained in the Permit (the "NOI Letter"). Ex. M. The NOI Letter alleges that Argus (1) has caused or contributed to violations of the water quality standards for selenium, (2) failed to comply with its obligations under Order No. 1091, and (3) violated associated performance standards under SMCRA.[4]  *Id.*  Thereafter, on June 14, 2010, WVDEP filed a civil enforcement action against Argus in the Circuit Court of Mingo County (the "Mingo County Action"), which alleged violations of the state-law counterparts to the CWA and SMCRA. Ex. N.[5]  Specifically, the Mingo County Action alleges that Argus (1) violated effluent limitations in the Permit for selenium, (2) caused or contributed to violations of water quality standards for selenium, and (3) violated Surface Mining Permit No. S-5026-98 and associated performance standards as a result of its violation of the Permit.  *Id.*  The Complaint specifically seeks compliance with all terms and conditions of Argus's Permit and its Surface Mining Permit, as well as the establishment of an appropriate, immediately enforceable compliance schedule for selenium at Outlets 006 and 009.[6]  Ex. O (Amended Complaint) at 8-9. The Mingo County Action includes claims against Argus relating to the very same issues raised

---

[4]     Plaintiffs' claims under SMCRA are entirely dependent upon a finding by this Court that Argus is in violation of the CWA.  That is, if Plaintiffs' CWA claims fail, their SMCRA claims must also fail. *Hobet I*, 2008 WL 5377799, *7 n.1.

[5]     The full caption of this civil action is *Scott G. Mandirola, Director, Division of Water and Waste Management, and Thomas L. Clarke, Director, Division of Mining and Reclamation, West Virginia Department of Environmental Protection v. Argus Energy WV, LLC*, Civ. Action No. 10-C-191.

[6]     Although Plaintiffs doubtless will attribute nefarious motives to the Mingo County Action, it should be noted that such enforcement actions have been expressly endorsed by USEPA as a valid method for imposing compliance schedules.  *See* Letter from Jon M. Capacasa to Ms. Lisa A. McClung and Mr. Randy Huffman (November 16, 2007) regarding the implementation of compliance schedules under the CWA.  Ex. P ("Judicial decrees, including consent decrees, may also include compliance schedules that are appropriate.  *See* [33 U.S.C. § 1319(b).]  Compliance schedules in judicial decrees should specify a timetable for achieving compliance as quickly as possible, and should include interim dates and progress reports so that the agency can monitor compliance progress").

in the instant citizen suit, with the exception that it does not include a specific allegation that Argus had violated Order No. 1091.

WVDEP filed an Amended Complaint in the Mingo County Action on July 7, 2010. Ex. O. Argus filed its Answer on July 23, 2010. Argus and WVDEP subsequently have engaged in extensive discussions regarding the potential resolution of that enforcement action short of proceeding to trial. *See* Ex. Q (quarterly status reports submitted to the WVEQB by the parties reflecting these ongoing negotiations and anticipation of finalization of settlement). On October 7, 2011, WVDEP lodged a proposed consent decree with the Mingo County Circuit Court to resolve the agency's claims against Argus (the "Draft Consent Decree"). Ex. R. Prior to entry, the Draft Consent Decree was subject to 30-day public comment period. W. Va. Code St. R. 47-30-15.2.c. Notice of the Draft Consent Decree was published in the *Williamson Daily News* on October 15, 2011. Ex. S. WVDEP also provided notice of the proposed settlement to members of the general public who are subscribed to the agency's electronic mailing list on October 12, 2011. Ex. T. The public comment period closed on November 14, 2011, and no comments were submitted by any member of the public, including Plaintiffs. Accordingly, Judge Thornsbury entered the final Consent Decree as proposed on December 2, 2011. Ex. C. The Consent Decree (1) assesses a civil penalty of $21,000; (2) imposes significant injunctive relief and an aggressive schedule requiring Argus to undertake specific measures to achieve compliance with final selenium limits at Outlets 006 and 009; (3) establishes stipulated penalties for any failure to achieve increasingly stringent interim limitations for selenium at Outlets 006 and 009 while Argus moves towards compliance with the final selenium limits; and (4) requires compliance with the final limits for selenium at these two outfalls by November 15, 2012. *Id.*

## LEGAL STANDARD

When deciding a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), a federal court presumes that it lacks jurisdiction over a proceeding unless the plaintiff affirmatively demonstrates that jurisdiction exists. *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999). The plaintiff bears the burden of establishing that the court has subject matter jurisdiction over its claim. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 376-78 (1994). In determining whether jurisdiction exists, the district court regards the allegations in the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *Trentacosta v. Frontier Pacific Aircraft Indus.*, 813 F.2d 1553, 1558 (9th Cir. 1987)). The district court should apply the standard applicable to a motion for summary judgment, which requires the nonmoving party to set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. *Id*. The moving party should prevail if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. *Id.*

## ARGUMENT

**A.   Plaintiffs' citizen suit has been mooted by the entry of the final Consent Decree in the Mingo County Action.**

The Circuit Court of Mingo County has entered a Consent Decree resolving all of WVDEP's claims against Argus in the parallel state action on December 2, 2011, which has rendered this citizen suit entirely moot. As discussed above, the Consent Decree (1) assesses a civil penalty of $21,000 for violations of effluent limitations in the Permit between June 1, 2007 and June 30, 2011, including exceedances of the final selenium limits after April 5, 2010, Ex. C,

¶ 37; (2) imposes significant injunctive relief and an aggressive schedule of measures to be undertaken such that Argus will achieve compliance with the final limits for selenium at Outlets 006 and 009 as soon as possible, but no later than November 15, 2012, *id.* ¶ 36 and Ex. 1; (3) establishes stipulated penalties for any effluent limit violations that occurred between July 1, 2011 and the date of entry of the Decree, including exceedances of the final selenium limits at Outlets 006 and 009, *id.* ¶ 44; (4) establishes stipulated penalties for any failure by Argus to achieve increasingly restrictive interim limitations for selenium at Outlets 006 and 009 during the term of the Consent Decree, *id.* ¶¶ 38-39, 41; (5) establishes stipulated penalties for violations of effluent limitations contained in the Permit other than the limits for selenium at Outlets 006 and 009 during the term of the Consent Decree and for violations of the terms and conditions of the Consent Decree, including the injunctive relief, *id.* ¶¶ 42-43; and (6) requires compliance with the final limits for selenium at Outlets 006 and 009 no later than November 15, 2012, *id.* ¶ 36.g.  By its terms, the Consent Decree does not constitute a modification of the Permit, and therefore does not relieve Argus of its obligation to comply with the terms and conditions of the Permit. *Id.* ¶ 51.

Article III of the United States Constitution prescribes that courts may hear only continuing cases and controversies. *Ohio Valley Envtl. Coal., Inc. v. Hobet Mining,* LLC ("*Hobet I*"), 2008 WL 5377799, *6 (S.D. W. Va. Dec. 18, 2008) ("*Hobet I*").  "Simply stated, a case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the out-come." *Id.*  When a case has been rendered moot, "a federal court has no constitutional authority to resolve the issues that it presents." *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 525 (5th Cir. 2008).  As this Court has recognized, "[d]evelopments in a parallel government prosecution, subsequent to the filing of a citizen's

complaint, may moot the citizen suit." *Hobet I*, 2011 WL 5377799 at \*6; *see also Ohio Valley Envtl. Coal., Inc. v. Maple Coal Co.*, --- F. Supp. 2d ----, 2011 WL 3874576, \*14 (S.D. W. Va. Sept. 2, 2011). Significantly, the Second, Fifth and Eighth Circuit Courts of Appeals have determined that the standard for evaluating whether a judicially enforceable consent order has mooted a citizen action should be more deferential to the defendant than the high standard applicable to voluntary post-complaint compliance, holding that the proper standard should be whether there exists a "realistic prospect that violations alleged in [the plaintiffs'] complaint will continue notwithstanding the consent decree." *City of Dallas*, 529 F.3d at 528; *Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 355-56 (8th Cir. 1998); *Atl. States Legal Found., Inc. v. Eastman Kodak Co.*, 933 F.2d 124, 128 (2d Cir. 1991).[7] The Court must consider "whether violations will 'continue' in the sense that the violations will not be cured even after the remedial plan imposed by the consent decree has been fully implemented in accordance with reasonable timetables." *City of Dallas*, 529 F.3d at 530.

In the present case, the Consent Decree establishes a judicially enforceable timetable for Argus to commence and complete construction of any additional treatment systems necessary to achieve compliance with the final effluent limitations for selenium at Outlets 006 and 009 no later than November 15, 2012. Ex. C, ¶ 36. The Consent Decree's schedule of compliance— which is quite aggressive in that it provides for compliance with the selenium limitations less than one year after entry of the Decree—is reasonable, and this injunctive relief, combined with the civil and stipulated penalties to be imposed, entirely moot Plaintiffs' claims for relief as set

---

[7]      These courts reasoned that "a more deferential standard is appropriate because [t]he primary function of a citizen suit is to spur agency enforcement of law. Creating a high standard for mootness would discourage defendants in a citizen [suit] from entering a consent decree with federal or state enforcement agencies . . . shift[ing] primary enforcement responsibility from the expert agencies to the necessarily generalist courts." *Hobet I*, 2008 WL 5377799 at \*7 (alterations in original, but with internal citations and quotations omitted).

forth in their Complaint.  The injunctive relief requested by Plaintiffs has been mooted by the judicially enforceable injunctive measures included in the Consent Decree.  *See, e.g., Hobet I*, 2008 WL 5377799 at *7-8.  Plaintiffs' requests for civil penalties are likewise mooted, as each of the exceedances identified in Appendix A to their Complaint—indeed, all exceedances of the final selenium limits at Outlets 006 and 009 through the date of entry of the Consent Decree— will be subject to a penalty.  *See* Ex. C, ¶¶ 37 and 44; *Hobet I*, 2008 WL 5377799 at *9.

The fact that the penalties imposed under the Consent Decree may be less than those sought by Plaintiffs in this action is not a reason to allow this citizen suit to proceed.  *Hobet I*, 2008 WL 5377799 at *9.  Indeed, "[i]f citizens could sue for civil penalties that the government chose to forgo, they would usurp the primary enforcer role and undermine the sate's discretion." *Id.* (citing *Gwaltney*, 484 U.S. at 61).  "Because of the discretion granted to state governments as primary enforcers of the [CWA], various courts have been reluctant to allow collateral attacks on civil penalties contained within a binding consent order."  *Id.* (citing *City of Dallas*, 529 F.3d at 538; *Comfort Lake*, 138 F.3d at 356).  After weighing all of the penalty assessment factors required under the CWA, WVDEP has arrived at a civil penalty that is appropriate in this case. Plaintiffs should not be allowed to disturb that settlement through this citizen suit, particularly given their refusal to participate in the state court process.

In summary, both the injunctive relief and civil penalty components of Plaintiffs' Complaint have been completely mooted by the entry of the Consent Decree in the Mingo County Action.  The civil penalty and injunctive relief imposed by the Decree are fair and appropriate based on the facts and circumstances presented.  Plaintiffs should not be able to simply ignore binding state enforcement proceedings and the entry of a final enforcement decree by a state circuit court, and instead ask a federal district court to likewise ignore the Hon. Judge

Thornsbury's Decree and allow their collateral attack on the very issues that have just been fully and finally resolved. Plaintiffs' suit must be dismissed.

**B.** **Plaintiffs' citizen suit is statutorily barred because WVDEP commenced and is diligently prosecuting a civil enforcement action against Argus.**

The right to file a citizen suit is not absolute. While Plaintiffs assert a statutory right of action under the CWA's citizen suit provision (authorizing "any citizen [to] commence a civil action on his own behalf" against any person alleged to be in violation of an effluent standard or limitation established under the Act or an order issued by the state with respect to such standard or limitation), 33 U.S.C. § 1365(a)(1), and SMCRA's parallel provision, 30 U.S.C. § 1270(a)(1), both statutes place express limitations upon a citizen's right to invoke the judicial enforcement process. Indeed, both establish an **absolute bar** to a citizen suit when a delegated state authority (such as WVDEP) "has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State" and the purpose of that action is to "require compliance with the standard, limitation, or order" alleged to have been violated in the citizen's notice of intent to sue. 33 U.S.C. § 1365(b)(1)(B); 30 U.S.C. § 1270(b)(1)(B).

The proper role of the citizen suit in the hierarchy of CWA enforcement is well-established. Indeed, following its examination of the legislative history of the CWA, the United States Supreme Court explained that "the citizen suit is meant to **supplement** rather than to **supplant** governmental action." *Gwaltney of Smithfield v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987) (emphasis supplied); *see also N. & S. Rivers Watershed Ass'n, Inc. v. Scituate*, 949 F.2d 552, 555 (1st Cir. 1992).[8] "Particularly when the EPA [or State agency] chooses to enforce the CWA through a consent decree, failure to defer to its judgment can

---

[8]      *See also Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, Maryland*, 523 F.3d 453, 456 (4th Cir. 2008) (citing *Gwaltney*); *Karr v. Hefner*, 475 F.3d 1192, 1197 (10th Cir. 2007) (noting that "[c]itizen lawsuits under the CWA have a merely 'interstitial' role; Congress did not intend for them to be even 'potentially intrusive' on agency discretion").

undermine agency strategy," and courts should avoid interpreting the CWA's citizen suit provision "in such a manner that would undermine the . . . ability to reach voluntary settlements with defendants." *Karr v. Hefner*, 475 F.3d 1192, 1197-98 (10th Cir. 2007).

To prevent citizen suits from interfering with legitimate enforcement efforts undertaken by the state agency charged with the administration of the CWA, Congress has provided that a citizen suit will be absolutely barred if (1) a state agency has commenced a civil or criminal enforcement action against the defendant and (2) the agency has diligently prosecuted that action. 33 U.S.C. § 1365(b)(2)(B); 30 U.S.C. § 1270(b)(2)(B). The question of whether a state enforcement action has been diligently prosecuted is determined as of the date that Plaintiffs' Complaint was filed—here, October 7, 2011. *Ohio Valley Envtl. Coal., Inc. v. Hobet Mining, LLC*, 723 F. Supp.2d 886, 905 (S.D. W. Va. 2010) ("*Hobet II*") (citing cases). Because the Mingo County Action clearly had been commenced in advance of Plaintiffs' Complaint in this civil action, the only question is whether that action has been diligently prosecuted.

Courts presume that a state agency has diligently prosecuted an enforcement action under the CWA or SMCRA absent convincing evidence to the contrary. *Piney Run*, 523 F.3d at 459. Showing that a state's prosecution was not diligent is a "high burden." *Id.* at 460. To constitute diligent prosecution, a state enforcement action must only be "capable of requiring compliance with the Act and . . . in good faith calculated to do so." *Id.* at 459. The majority of courts have held that citizen-plaintiffs can satisfy the heavy burden of establishing the non-diligence of a state enforcement action only by demonstrating through persuasive evidence that the state has engaged in a pattern of conduct in its prosecution that appears dilatory, collusive or otherwise in bad faith. *Connecticut Coastal Fisherman's Ass'n v Remington Arms Co., Inc*, 777 F. Supp. 173,

183 (D. Conn. 1991).[9]  No such circumstances are present here.  There has been no collusion between WVDEP and Argus in connection with the Mingo County Action, and none is alleged. The Mingo County Action is demonstrably not an attempt by WVDEP to allow Argus to delay or avoid its responsibility for achieving compliance with its final selenium effluent limits.  Rather, it is the very mechanism by which such compliance will be achieved.[10]

Additionally, when reviewing the diligence of a state agency, the Court "may rely on evidence from the state court docket to determine 'the prospects that the state suit would proceed expeditiously to a final resolution[,]'" but "must also consider the context surrounding the state prosecution."  *Hobet I*, 2008 WL 5377799, *5.  Contrary to Plaintiffs' allegation that WVDEP "[sat] on [its] 'enforcement' action, literally doing nothing," Compl. at ¶ 5, Argus and WVDEP had diligently engaged in settlement negotiations during the period preceding the filing of Plaintiffs' Complaint.  Although not reflected on the face of the docket sheet, that these settlement negotiations were ongoing is reflected in the quarterly status reports filed with the WVEQB on June 1, 2011 and September 1, 2011 in conjunction with the fundamentally related WVEQB actions.  Ex. Q.  Finalization of the Draft Consent Decree ultimately took longer than the parties anticipated at the time that those status reports were filed.  That settlement discussion took longer than hoped, however, is certainly not unique to this case, and certainly does not rise to the level of "lacking diligence."  Here, using the docket sheet to determine diligence is

---

[9]      *See also Jones v. City of Lakeland*, 224 F.3d 518, 522-23 (6th Cir. 2000) (holding a ten-year administrative enforcement action was not diligent); *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 890 F. Supp., 470, 474-79 (D.S.C. 1995) (finding that state's extensive cooperation with defendant contributed to finding that no diligent prosecution barring a citizen suit existed); *N.Y. Coastal Fishermen's Ass'n v N.Y. City Dept. of Sanitation*, 772 F. Supp. 162, 168 (S.D.N.Y. 1991) (criticizing the state for "acting as a pen pal, not a prosecutor" during its eight-year involvement with the defendant's non-compliance).

[10]     As noted *supra*, n.6, USEPA has expressly sanctioned the use of judicial actions to establish necessary compliance schedules.

inappropriate.   The CWA should not be construed to require parties actively engaged in settlement negotiations to contemporaneously engage in additional litigation measures solely for the purpose of creating docket activity.   Plaintiffs here should not be allowed to proceed with a completely duplicative citizen enforcement action simply because the parties to the state action that they chose to ignore took more time to complete than they have arbitrarily deemed diligent.

Furthermore, Argus understands that WVDEP's Complaint in the Mingo County Action is similar to a complaint this Court recently held to be "not diligent" because the relief requested was "vague" and sought neither to enforce the permit's compliance deadline of April 5, 2010 nor the July 2012 deadline contained in the company's (denied) permit modification request.  *Maple*, 2011 WL 3874576 at *13.  Argus notes that the relevant language in WVDEP's Complaint in the Mingo County Action parallels the relief requested by the agency in its case against Maple. With all due respect to this Court, however, Argus submits that the relief requested in the Complaint is neither "vague" nor "non-diligent":  ultimately, it seeks (1) compliance with "all terms and conditions" of Argus's Permit and Surface Mining Permit, and (2) a new, judicially enforceable schedule of compliance for selenium, with interim limitations for selenium during the term of this schedule and stipulated penalties for violations of the same.  Ex. O at 8-9. Significantly, the CWA requires all compliance schedules to "require compliance as soon as possible."   40 C.F.R. § 122.47(a)(1).   Thus, the question of determining an appropriate compliance schedule is a site-specific inquiry that falls particularly within the expertise of WVDEP, and in the case of selenium can be determined only after a careful review of the circumstances involved at a particular mining operation, including but not limited to site characteristics, sources of selenium contributions, selenium concentrations, flows, and potential treatment locations.  The language of WVDEP's Complaint allows for the development of a site-

specific treatment plan—with a final compliance date either before or after July 2012—based on information gathered and reviewed during the course of the case, whether through formal discovery or in conjunction with settlement negotiations.  Rather than declare the Mingo County Action non-diligent *per se* on the basis of a Complaint that recognizes the inherent site-specific nature of this process, the Court should defer to WVDEP's expertise in this matter, as the relief requested in the Mingo County Complaint makes clear that the purpose and goal of that enforcement action is to ensure Argus's compliance with all terms and conditions of the Permit.

In short, the record in this case does not overcome the presumption that WVDEP has diligently prosecuted the Mingo County Action.  As such, Plaintiffs' citizen suit is barred.

**C.   Plaintiffs cannot maintain their claims relating to Argus's alleged violation of the compliance deadlines contained in Order No. 1091 or the NPDES Permit.**

The only element of Plaintiffs' Complaint not included as an express allegation in WVDEP's Mingo County Action is the claim relating to Argus's alleged failure to comply with the deadlines set forth in Order No. 1091.  At the outset, Argus notes that in a recent decision this Court concluded that a similar order issued to another coal company had been incorporated into the underlying permit by a proper modification, and therefore the requirements of the order constituted valid and enforceable terms and conditions of the company's Permit.  *Maple*, 2011 WL 3874576 at *13.  Accordingly, the Court reasoned, the requirements of the order relating to the construction of selenium treatment systems were the subject of WVDEP's state court enforcement action, which sought, *inter alia*, compliance with **all** terms and conditions of the company's Permit.  *Id.*  The circumstances in the present case are precisely the same as those in *Maple*.  *See* Exs. B (modifying the Permit to include the requirements of Order No. 1091) and O (seeking compliance with all terms and conditions of the Permit).  Thus, if the Court finds that

the Mingo County Action precludes this citizen suit, Plaintiffs' Second Claim for Relief also must fail.

More fundamentally, however, Plaintiffs' Second Claim for Relief fails because it relates to wholly past violations. To maintain a citizen suit under the CWA, the Supreme Court requires citizen-plaintiffs to "allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney*, 484 U.S. at 57.[11] When violations are alleged that are wholly unconnected to past or future wrongdoing, "[m]ootness doctrine . . . protects defendants from the maintenance of suit under the [CWA]." *Id.* at 66-67. Whether a continuing violation exists must be evaluated of the time that the complaint is filed. *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 890 F.2d 690, 693-94 (4th Cir. 1989).

Whether a permittee is in continuing violation of a compliance schedule requires a different analysis than the traditional inquiry into whether a permittee is in continuing violation of an effluent limitation. The Fourth Circuit's recent decision in *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387 (4th Cir. 2011), is instructive here. In that case, Gaston Copper's NPDES permit, issued on March 1, 1991, contained a schedule of compliance for the company to achieve certain effluent limitations that were to become effective on June 1, 1992. Included in this compliance schedule was a requirement to submit final plans and specifications for any necessary upgrades to its treatment system by September 1, 1991. At Gaston Copper's request, the permitting agency extended this deadline from September 1, 1991 until November 15, 1991. When Gaston Copper determined that it would be unable to comply with the November deadline as well, the agency granted another extension until December 15,

---

[11]    Although the remainder of this section discusses Argus's alleged violations in the context of the CWA, this basic principle, rooted in mootness doctrine, also applies to defeat Plaintiffs' claims under SMCRA. *See supra* at n.4.

1991, but did not modify the permit to reflect this new compliance date.  Gaston Copper ultimately submitted the plan on December 23, 1991.  *Id.* at 391-92.

Citizen-plaintiffs filed suit against Gaston Copper on September 14, 1992, alleging various violations of the company's permit, including the failure to timely submit the final plans in accordance with the compliance schedule in its Permit.  *Id.* at 392.  Relying on the standard for a "continuing violation" established in *Gwaltney*, the Fourth Circuit held that the district court lacked subject matter jurisdiction to impose penalties for these violations because they were wholly past when the complaint was filed:

> When Gaston submitted its final plans on December 23, 1991, Gaston was in violation of the November 15, 1991 deadline in the amended permit for 38 days. However, after submitting those plans on December 23, 1991, Gaston was no longer engaged in any ongoing violation relating to this submission requirement. Thus, at the time the plaintiffs filed their complaint in July 1992, Gaston's violation of this submission requirement in the permit was "wholly past."

*Id.* at 403.

The rationale of *Gaston Copper* applies directly to the instant case.  Plaintiffs allege that Argus is in continuing violation of two deadlines contained in Order No. 1091:  (1) to begin construction of selenium treatment systems by October 5, 2008[12] and (2) to complete construction of those treatment systems by April 5, 2010.  Compl. ¶¶ 77-80.  However, none of these alleged violations, to the extent that they occurred at all, were continuing at the time that Plaintiffs filed their Complaint on October 4, 2011.  *See* Ex. C, ¶ 20; Ex. U (Affidavit of Randall R. Maggard).  While Argus's evaluation of this treatment is ongoing and Argus continues to adjust, refine and improve this approach as additional data is collected, these treatment systems were in place well before this citizen suit was initiated.  Accordingly, no continuing violation

---

[12]     In what appears to be a typographical error, Plaintiffs' Second Claim for Relief mistakenly identifies the relevant deadline for the commencement of construction of selenium treatment facilities as October 5, **2010**.  Compl. ¶¶ 77-78.

exists with respect to these construction requirements when Plaintiffs' Complaint was filed on October 4, 2011, and Plaintiffs' Second Claim for Relief must be dismissed.  *Gaston Copper*, 629 F.3d at 403.

**D.    This Court should abstain from hearing this case.**

In the alternative, this civil action also should be dismissed on the basis of abstention.  In *Younger v. Harris*, 401 U.S. 37 (1971), the Supreme Court established a three-part test for determining when federal courts should abstain from exercising jurisdiction over a case that would interfere with an ongoing state proceeding: (1) whether the proceedings constitute an ongoing state judicial proceeding; (2) whether the proceedings implicate important state interests; and (3) whether there is adequate opportunity to present the federal claims in the state proceeding.  *Hobet II*, 723 F. Supp. 2d at 919 (citing *Younger*, internal citations omitted).

The Mingo County Action is clearly an ongoing state judicial proceeding.  Furthermore, WVDEP has a strong interest in consistently administering the environmental statutes and regulations of the State of West Virginia and protecting the health and welfare of its citizens and the environment.  The injunctive relief sought by Plaintiffs would directly contradict and interfere with the injunctive relief that has been crafted during extensive discussions between the parties to the Mingo County Action, and which has been approved by the circuit court.  Such interference is exactly what the *Younger* abstention doctrine is designed to avoid.  Finally, Plaintiffs had ample opportunity to participate in the Mingo County Action and to press their claims and concerns in that action.  Although the CWA and SMCRA allow concurrent federal citizen suit and state enforcement actions in certain circumstances, that is the exception and not the rule.  The intention of Congress to preserve and protect the rights of the States to enforce the

CWA is clear and should be respected, particularly where the state enforcement action has resulted in an approved Consent Decree. Accordingly, the Court should abstain from this case.

## **CONCLUSION**

For the reasons set forth above, Argus respectfully requests that this Court dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted this 8th day of December, 2011.

**ARGUS ENERGY, LLC D/B/A ARGUS ENERGY WV, LLC**

By SPILMAN THOMAS & BATTLE, PLLC

_____/s/ James S. Crockett, Jr._____
James S. Crockett, Jr. (WV State Bar No. 9229)
Allyn G. Turner (WV State Bar No. 5561)
M. Katherine Crockett (WV State Bar No. 10799)
Spilman Thomas & Battle, PLLC
Post Office Box 273
Charleston, West Virginia 25321-0273
Telephone: (304) 340-3800
Facsimile: (304) 340-3801
jcrockett@spilmanlaw.com
aturner@spilmanlaw.com
kcrockett@spilmanlaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,
and SIERRA CLUB,

        Plaintiffs,

v.                                      Civil Action No.  3:11-0696

ARGUS ENERGY, LLC D/B/A ARGUS
ENERGY WV, LLC,

        Defendant.

## CERTIFICATE OF SERVICE

I, James S. Crockett, Jr., counsel for Argus Energy, LLC d/b/a Argus Energy WV, LLC, hereby certify that on December 8, 2011 I electronically filed the foregoing **Defendant Argus Energy, LLC d/b/a Argus Energy WV, LLC's Memorandum in Support of its Motion to Dismiss** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

> J. Michael Becher, Esq.
> Derek O. Teaney, Esq.
> Joseph M. Lovett, Esq.
> Appalachian Mountain Advocates
> ***Counsel for Plaintiffs***

                                /s/James S. Crockett, Jr._____
                                James S. Crockett, Jr. (WV State Bar No. 9229)
                                Allyn G. Turner (WV State Bar No. 5561)
                                M. Katherine Crockett (WV State Bar No. 10799)
                                Spilman Thomas & Battle, PLLC
                                Post Office Box 273
                                Charleston, West Virginia 25321-0273
                                Telephone: (304) 340-3800
                                Facsimile: (304) 340-3801
                                jcrockett@spilmanlaw.com